Your Honor, it's the 13th of the morning call, 2-11-1179, Mary Lee Eschbach v. McHenry Police Pension Board. On behalf of the Appellant, Mr. Mark B. Cuccia. On behalf of the Appellant, Mr. Richard J. Johnson. Good morning, Counsel. Good morning. Mr. Cuccia. Please support Mark Cuccia on behalf of the Appellant, Mary Lee Eschbach. As you know, the Pension Board denied Ms. Eschbach's application for a non-duty disability pension on the basis that they alleged her employment had been terminated prior to the day she applied for the pension. We believe the Board's decision is improper and incorrect for a couple of reasons. First, I'll talk about today that even if she had been appropriately terminated before she applied, that does not render her ineligible for her disability pension. And so I'll have that discussion first, and then I'll talk about the circumstances surrounding this alleged termination, which I believe show that she wasn't terminated or not appropriately and why that's relevant. So first of all, even if she had been terminated appropriately before the application, that would not render her ineligible for the disability pension. There's a couple of reasons I say that. First of all, I start by looking at the plain language in the statute, Section 114.2. It says that a police officer who becomes disabled as a result of any cause other than the performance of duty and who is found to be physically or mentally disabled so as to render necessary his or her suspension or retirement from the police service shall be entitled to those benefits. Those facts are true. Mary Lee Eschbach, prior to January 2010, we could go through the medical records and figure out when she became disabled, it's not important now, but prior to January 2010, Mary Lee Eschbach, a police officer, became disabled as a result of a cause other than the performance of her duty and is found to be mentally and physically disabled by her doctors. The plain language of the statute applies. It matches. And she became disabled due to what? She became disabled as a result of her blood clotting condition. We never got a chance in the underlying case to address the medical records and the blood clotting condition itself, but she has a significant blood clotting condition. There were records included in the... But when did she first raise that, though? Well, she... She initially started out, as I recall in the history of this case, with an on-duty disability claim, correct? Correct, involving arrest. And then that went on and went on appeal. Right. So when did she raise this blood clot issue? Well, the blood clot issue became a disabling after the hearing on the first case. So there's some arguments about, well, why didn't she raise it in the first hearing? The reason she didn't raise it in the first hearing is because it didn't become a disabling condition until after that. But she wasn't a police officer at the time she raised it. I mean, isn't that one of the requirements? She has to be a police officer at the time of the alleged injury or disability and at the time she makes the claim. She was still a member of the police department at the time that the disabling condition of blood clotting occurred, which was starting in late 2008 through 2010. Okay. So she was still a police officer then. All right. But then the second requirement? The second requirement that they're arguing, which I don't agree with, which I'll explain, is that she'd be a police officer at the time she applies. Right. And that's not the case, in my opinion, and here's why. First of all, I read the direct language of the statute that I don't think says anything about that requirement. She met the plain language of the statute. They're arguing that, yeah, but she also has to be a police officer at the time of discharge. And they're pointing to the DeFalco case to rely on that at the board. But here's the thing about the DeFalco case. The DeFalco case recognized that the issue of whether you have to be a police officer at the time of discharge is involving some extra interpretation. It's not plainly evident. They spent a lot of time in the DeFalco decision explaining the legislative intent on this issue. Three different spots in the DeFalco decision, they recite the legislative intent. First, they said that it is to help provide only for firefighters. That was a firefighter case. This is a police case. But they said that the legislative intent was only for firefighters who, if not for their disability, would still be employed as firefighters and draw on their regular salary. Next page, they repeat that same legislative intent when they say disability pensions are to be given only to firefighters who would still be employed as firefighters, if not for their disability. In summary, at the end of the DeFalco case, they reiterate it again. In summary, we conclude that the primary purpose of the establishment of a duty-related disability pension is to provide for the benefit for firefighters who would still be employed as firefighters and receiving a salary, if not for their disability. But isn't that exactly what the problem is here? She was not terminated because of a disability. She failed to report back to the department after the denial of her on-duty disability. So how can you say that she's terminated because she'd still be working there if it was not for her disability? Well, because it's a fact that the only reason she didn't report back to work was because of her disability. But she never contacted them to tell them that. How does anybody know that? But this is not a notice issue. The legislative intent is, would she have been back to work but for her disability? And she testified two different times that she would have reported back to work, if not for her blood clotting disability. Let's apply some common sense here. According to your argument is that if somebody has a condition, albeit not communicated, while they are a police officer, okay, you can document that. Somebody can disappear and, what, 20 years later file a claim and recover because the disability allegedly occurred while they were a police officer, even though they were 20 years after retirement? They then raise this? What's the outer boundaries of your argument? Well, that would, if the disability occurred during the employment, she would, under that hypothetical, or he, be allowed to apply for the disability. That's right. Even though they're no longer police officers, even though they disappeared off the planet for 20 years? But they would have to establish, I mean, there's a big burden here. There's a burden that the disability, the thing that caused them to disappear, was from a disability, was related to the disability. That's almost, I mean, that hypothetical, although it's possible, it's hard to imagine how someone's disappearance and, therefore, their lack of reporting to work or communicating would be related to a disability. In this case, there's no more butting into it. No one's really disputing that the reason she didn't report to work was because of the disability. But something else, too, in this case, that's different from your hypothetical. The board, the pension board, is not disputing it? Well, their position, as I understand it, is, look, this woman, after she was denied the on-duty disability, disappeared. We don't know what happened to her. She never showed up for work and never communicated why she was gone. Two things. One, there is no dispute in the record that that's the reason she didn't report to work. But, number two, as the record indicates and she testified to, she had an ongoing workers' compensation case going on at that time. So they can argue that they didn't know what was going on, but the evidence in the record indicates otherwise, because the workers' compensation case was still going on at that time. And as she testified, as part of the settlement negotiations in the workers' compensation case, they suggest that she applied for the duty disability. But she's not disabled. How does the workers' compensation case being pending keep her from reporting back to the department after she was denied the on-duty disability? I mean, she has an on-duty disability claim. That's denied. Then you're saying she's disabled, she's got a workers' comp case. But the workers' comp case wouldn't keep her from reporting back to the department and saying, here I am, I can't come back because of this disability. But the employer and the pension board are aware of the fact that she can't come back because of the blood clotting condition, because these are the active negotiations that are going on in the workers' compensation case. The workers' compensation case was settled, as she testified to, with the understanding that she's going to apply for the duty disability, the non-duty disability. They knew about it. So you're saying that those issues came up during the negotiation, that is, the blood clot issues? Correct. They knew that she had a non-duty disability because of the records that were exchanged in the workers' compensation case. They knew. They were the ones who suggested we settle the workers' compensation case and have her apply for the non-duty disability. She testified to this in the record, okay, that these were the negotiations. Setting that aside for a second, I'm looking and I'm trying to listen very carefully to your argument. What is the reason why she couldn't have sent a letter to the chief or dropped by the department? Why couldn't she have communicated with her superiors as to what was going on? It doesn't strike you as odd that nobody hears her? Well, I think she could have done that. I agree. That would have been a good call. I agree. But the fact that she didn't doesn't render this case ineligible for a pension. But now she was negotiating with the pension board. Is that right? She has a workers' compensation case at that time which is negotiated not with the pension board but with the city's attorney. But then they're in communication because the city's, as she testified to, the city's attorney suggested to her that she apply and was eligible for, she said, for the non-duty disability. But you never told her not to talk to anybody in the department. She could have talked to somebody. I agree. But I don't think that's fatal to the case. That's not what the DeFalco Supreme Court was saying, that they have a burden to notify everybody. They said that, look, if she would have been a police officer but for this disability, then the fact that she was discharged prior to the application date doesn't render it ineligible. And that's the case in this set of facts. Let's assume that she was discharged. Can you go on to your second argument about, if you would, about bad faith and all that? All right. Well, if you look at the circuit, first of all, the board is saying, well, it's not relevant how she was fired because we didn't do it. But that's not true because, number one, if she wasn't actually fired, obviously that defeats the argument entirely. Number two, if it's an invalid termination because she was never provided notice, that would also make the termination invalid and ineffective. What is her claim against the invalid notice? Look, let's assume for a second that she didn't get notice and that was in violation of the collective bargaining agreement. Why does she now have an action regarding this disability? How does this affect the pension board, which is a separate entity from the city and the police department? It affects the pension board because, number one, the facts indicate a couple of things. Number one, in my opinion, the facts indicate that she wasn't actually terminated. Okay? And I'll explain what I mean by that. But, number two, even if they did complete the paperwork like they're claiming they did, it wouldn't have been a valid termination. And, therefore, they can't come in and say she was terminated. A brief discussion of the main facts will help understand what I'm arguing. Okay? With regard to the timeline, they got the decision from the appellate court on the old case on March 31, 2010. March 31st. They're claiming that her employment was terminated or separated on June 10th, 2010. Several months later, they produce no evidence that that actually took place. There's no document dated June 10th. There's no testimony from anybody who was involved in that about what happened on June 10th. This June 10th date magically appears. They're not even suggesting that she was sent any kind of letter or notice, nor does any document in the record suggest that a proof of service or a letter was sent. It just magically appears this date of June 10th. More important than that, when do they send notice of the quote-unquote separation from June 10th of 2010? On January 24th, 2011. Now, if they really fired her on June of 2010, which they're claiming, why would a notice not have been sent to her on that date? Why would a notice not have been sent to her until January 24th, 2011? Just weeks before they received the second application from her non-duty disability pension, I suggest that the answer is they never did terminate her back in June, that they created this paperwork in order to deny her pension so they could say, oh, but she was discharged back then. I know that's a harsh accusation, but I think the facts bear it out. Not only do these dates suggest something funny going on, but the testimony of Mrs. Zanini, who was the HR person for the municipality. The HR manager. The chief can fire her, right? I mean, the CBA says the chief can fire her. The chief has that authority to fire her. Well, I would potentially agree with that. Okay, so the chief testified that he fired her in June. No, no, that's my point. Nobody testified that. Well, Zanini said she was. Here's what Zanini said. Here's what Zanini said. Zanini, I asked, well, what is this date in June 10th? What happened then? She doesn't know. I said, well, this notice of separation completed in January 2011, much later, just before the application. Why was that completed then? She's the HR person. No idea. I understand all that. I want to get to my main question, which is you have this termination, and there's paperwork that there was a separation notice. It wasn't sent. But there's a notice that at least as of January, she was separated, which was before she filed the application. So let's assume all this nefarious conduct on the part of the chief, the city, the police department, whatever. I mean, isn't it her path to file a grievance or an arbitration through the CBA to get her job back, not to go to the police board and say, I was mistaken with fire. I was inappropriately fired. I mean, if there's a fire, the chief can fire. We know that. Anybody who wants to complain about the chief's actions has to go through the CBA, go through the grievance arbitration process. She didn't do that. So she's fired in January or terminated, whatever. Okay? We have evidence of that. And then she doesn't do anything once she finds out about this. She doesn't file any grievance. She doesn't file any arbitration request. And so now she goes to the board, and the board is now supposed to look back at her due process rights and this and that and the other thing and make a determination based on that? With all due respect, I don't think that's a correct recitation of the facts for two reasons. One is she never got the notice. That's what they argued in the lower courts. Well, why didn't she pursue a grievance for being discharged? Because she never received the notice. She testified. She found out about it sometime. After the pension application was already made. That's when she found out about it. Why didn't you file a grievance, though? Well, I can assure you there will be a lawsuit if this doesn't come through, because what she is is she's entitled to the disability pension, which would offset any damages she would have from being fired. She needs to be consistent. Her position is that she can't do the job right now as a result of this pension. Here's the other thing I wanted to point out to you, though. This is very important, I think, that Mrs. Zanini's testimony, she said that she had had a conversation with the chief about what date the separation date should be, this June 10th date. And I asked her, well, when did you have the conversation to determine the separation date? She said, I said, was it before or after June? She said, probably after. Probably after June? They had the conversation about when the termination date should be? Obviously, this stuff was created retroactively. And so now we're just supposed to believe that it's a coincidence that three weeks before they received her application the second time, they created this notice. It's not believable. They knew she was going to apply. They knew it because she had already called and requested the application. Then she sent it in. They got it, sent it back to her. She had to have it notarized, then sent it back again. And that date is 2-14, the second time. They knew she was applying for the disability, and then for no explanation, a magical notice of separation form appears. It's not legitimate. Counsel, the time is up, but you'll have time on rebuttal. Thank you. Mr. Kuchelski. Let me report to Mr. Kuchelski on behalf of the Kennedy Police Pension Board. One of the issues I have with Counsel's argument is he talks about they, and he lumps the pension fund, I guess, with the city of McHenry, who's not a party to this litigation. We are two separate entities under a number of cases cited, Dollard from this court and Dempsey from this court. Dempsey, I should say. Two separate entities. When an employee doesn't show up, doesn't contact the employer, the employer reasonably can't believe that the employee has abandoned the employment. That's what happened here. And I think that's a logical inference to make, but he's hammering this issue. Did the department, did anybody attempt to give her notice of the separation in June? I mean, once it was obvious, as you say, that she was not coming back, there's no communication, she disappears, did somebody serve her with a notice? We have no evidence of that, and one of the reasons I believe we don't is because Ms. Eschbach testified at her second disability hearing that after this court ruled in March of 2010, she never contacted the police department and she never notified them of her new address. Well, wouldn't they attempt to send it to her last known address? They may have, but there's nothing in the record that indicates that. But we do have Ms. Zanini's testimony in the record that she was terminated on 6-2-2010, and there's a separation form. Now, the fact that the separation form is dated differently is irrelevant. The fact of the matter is the evidence is clear that she was terminated, and the termination was reasonable here in anybody's mind because this lady, as you said, disappeared off the face of the earth for nine and a half months. Can she logically believe in February of 2011 that she was still an employee at the police department and she hadn't contacted them in nine and a half months? What about the negotiations that were ongoing with regard to the workman's comp claim? Those negotiations had nothing to do with the pension board. We have no control or input into the comp claim. We didn't even know the comp claim was still pending. They were two separate entities. All we knew is she files for, and actually we didn't even know the exact date of her termination until after she filed her application, and we went back to the city and said, what's the status of SBAC? The status of SBAC is she was terminated in 6-2-2010 because nobody heard from her. And what about counsel's argument that the reason she didn't return to work is because of her disability, the blood clot disability? If that were the case, wouldn't it have been logical to contact the police department and say, look, I've got other conditions. I'm requesting family medical leave. I'm requesting to be put on some sort of inactive status or whatever. She should have done something. There's a couple other things she didn't do. First of all, when this case initially went to hearing on the wrist injury in 2008, she already had the blood clot condition. She could have easily either amended the application or argued in the alternative that she was disabled from the blood clot condition at that point in time. She didn't do so. After this court ruled, March of 2010, she could have filed a new application with the pension board requesting a pension, this time on the basis of her blood clot condition. She didn't do that. And when she does find out that she was terminated, though I think it would be reasonable for anybody to believe if I hadn't heard from my employer nine and a half, ten months, that I don't have a job, when she did find out she was let go in June of 2010, she could have tried to file a grievance. There's a lot of things, I think, even certainly on the plaintiff's part, you've closely pointed out that should have been done in hindsight. Perhaps something was done in hindsight in the police department. But let's look at the legal effect of those things that were or were not done. Is there any legal requirement that in order to validly discharge an employee, the police department has to serve them with a notice? Are you aware of anything that says that? No, and I don't think the bargaining agreement specifies one way or another, but it does say that the Board of Fire and Police Commissioners is not involved in the termination decision. It's solely in the discretion of the police chief. So your position, as I understand it, then called out to its simplest terms, is very simple. You're saying, we're the board. We don't give pensions to somebody who's no longer a police officer, simply, period, correct? That's what the statute says. That's your position. Right. And that's what Defalco says, and that's what Freeberg says. And the statute that Mr. Kuja read you says a police officer. She doesn't fit that definition. He's got a broad, and he's saying there's no time limitations. Does the record contain anything about blood clots in 2008 while she was still a police officer? No. It does not? No. And when I asked at the second hearing, I said, well, why didn't you? When we went to the first hearing, why didn't you bring this up to the board? No answer. My guess is they probably thought it would jeopardize their conflict case somehow, but it would seem to me if this lady's suffering from multiple conditions, and I've done this for a long time, and believe me, if a police officer or a firefighter wants a disability pension and there's more than one thing wrong with them, you know, they throw it all in. And that's what should have been done. You're saying on the facts, forget about the legal requirements of notice, no notice, separate entities, apparently even if this was ongoing, it was never brought to anybody's attention until after she disappeared. Correct. Is that basically what you're saying? Correct. And, you know, I mean, all we can look at is we don't make the determination decisions. All we can look at is what her status is with the municipality. Do you look behind the termination to see whether notice was granted or whether proper? Do you look behind that determination to see whether notice was granted or whether proper? Because that's not our, you know, bailiwick. It's between the employee and the municipality. All I can do or all we can do is see if she's still an employee. And, again, from a common sense standpoint, you know, it makes all the sense in the world that they gave her two months and they didn't hear from her. I mean, normally in an employment context, if an employee doesn't call in one day, you know, the next day they're gone. And that's justified. And she didn't. The city had the authority to terminate her, and according to the city, they did. In any event, if there was a dispute there, she could have filed a grievance and pursued it directly with the city. Absolutely. Or, you know, and she's laying all this stuff on the city. But the city isn't a party to this. That's why I object to this term they. There is no they here. The defendant is the pension board. All this other stuff, this extraneous stuff with her comp claim or whatever, I don't know who told her what over there. But the pension board never told her that she can, you know, the fact that she's no longer a police officer, she's still eligible for a pension. So whoever told her that obviously didn't read the Falco and Freeburg or look at the statute because the prerequisite here is you have to be a police officer. And she was not when she filed her application. She could have done it timely. Unfortunately for her, she didn't. For whatever reason, I don't know. And if some arbitrator in the future says that the firing or the termination was improper and reinstates her back to that date, she'd be free to do so. I think that's highly unlikely at this juncture, given the fact that she was let go two years ago. But, yeah, I suppose if an arbitrator does rule that, and again, we would have no say-so or control because we would not be a party to that arbitration. It would be between the city, police department, and the grievant, I suppose. But, yeah, that would be something that we would find problematic, obviously. But if that happens, if her legal status is, you know, once again that of an employee, then, you know, then I suppose we'd have to address it. But as it stands now, it's clear that we had a termination, we had an application after the termination, and under case law, we are mandated to deny. This was not a situation where she was terminated because of her disability. Nobody even knew of her disability. And maybe it's shame on her. Maybe she should have said something to somebody, and we wouldn't be here today. But, you know, we're not mind readers. The city's not a mind reader. When an employee doesn't contact you, I think it's legitimate for an employer or police department to let them go. And that's all we looked at, whether she was an employee or not. Thank you very much. Thank you, counsel. Mr. Kucha? Thank you again. A couple of brief factual corrections. In fact, in the record, on page 69 of the record, are medical records from her treating physician, which says that she had some blood clotting issues in January of 2007, and that says she reports doing reasonably well subsequently to that until June of 2008, when she had a recurrence of great toe discoloration, and after that, all her surgeries began. The medical records do, in fact, on page 69 of the record, document that her blood clotting condition became disabling while she was a police officer and after the first hearing date. So that's just one important thing I wanted to correct. Number two, although in his brief on page 4, he cites the collective bargaining agreement as authority for the police chief to fire the claimant, it even states in there that the decision of the police chief is subject to the review of said decision through the grievance and arbitration procedure. So nothing about the collective bargaining agreement says they don't have to give notice. In fact, the collective bargaining agreement itself says that the decision is subject to the review. So, yes, they have to give her notice. How else could it be subject to review? We can use our common sense to say that, yes, they have to give notice under the collective bargaining agreement if they decide to terminate her. It's obvious. The board made a finding of the fact that she was terminated before she filed her application. How is that against the manifest weight of the evidence that's presented at the hearing? It's against the manifest weight of the evidence because of the factual deadlines that I quoted to you earlier. It doesn't make sense that she was fired when they're claiming for the time sequence that happened and also the testimony of Mrs. Annini that they did backdate these documents, that she said they determined the separation date after the date of the alleged separation. So the factual patterns don't make sense. It doesn't sound believable what they're saying. Is there any evidence that the notice of separation was prepared after she filed the application? The evidence of that is that they have no, that she never got it and that there's nothing in the record that says they sent it, which is counterintuitive. They produced a notice of separation form. Nothing on the form says proof of service. Nothing on the form says it was mailed. There was no form letter. Come on. It's dated on a certain date. It's dated on January 24th. It's dated, but in terms of service of it? Did Zanini testify that she prepared that document on the date that's listed on the document? No. She testified that it was prepared by the chief who wasn't there, but she consulted with the chief and the preparation of the form, and they had to figure out what date the separation should be. She had no idea how they came up with it. She had no idea why the form was dated when it was, and she admitted that it was probably determined after June when this date says she was fired. These are strange facts, and I believe the manifest way to the evidence goes against what they're saying, goes against the fact that she was terminated in June. But there would be more evidence of that, easily obtained evidence of that. It didn't happen. And the other thing is that they don't have any evidence that they sent it to her old address either. That doesn't get us anywhere to say she changed addresses. Besides, she got all the other notices. Now, the DeFalco Supreme Court thought it was relevant that there would be bad faith issues. They said in three different parts of their decision that there's no removal of the obligation of the employing municipality to act in good faith. On the second part of the DeFalco decision, they said that the plaintiff hasn't contested the legality of the discharge. Therefore, for purposes of our review, we shall assume it was proper. Not here. The DeFalco court thought it was very relevant. They mentioned it in two spots in their decision. He's saying it doesn't matter. It's not relevant. We're not the employing agency. That's not what DeFalco said. DeFalco thought it was irrelevant, according to DeFalco. The Dempsey case that he cited actually says that in the workers' compensation case where the workers' compensation commission made determinations about whether a person was disabled, was binding on the pension board, even though they weren't a party to the suit. That's against what he's saying, that these are separate entities that had nothing to do with each other. Here's a quote from the Dempsey case that he cited. Even though the board of trustees of the policeman's pension fund was not a party to the proceedings before the Illinois Industrial Commission, by the most logical interpretation of the statute creating the board, it is an agency of the city and is bound by the judgment rendered against the city. The Dempsey court said they're the same. And they are the same in terms of having access to the same knowledge. This Russ Giudicata argument, obviously she wasn't disabled. I quoted you the medical records. She didn't become disabled from the blood clotting condition until after the first hearing. He's suggesting she should have argued she was disabled when she didn't think she was disabled, and when the medical records don't support she was disabled. Of course she's not going to argue that then. The last thing I'm going to say is did they offer an explanation as to this interesting timing of the notice of separation completed just weeks before? How could that be? There must be some explanation. You have no explanation. I've given you one based on the facts. They have no explanation why they mysteriously completed that three weeks before the application. Their explanation is we're the pension board. We don't know what happened at City Hall. We don't know what happened at the police department. We're the pension board. But yet they produced the notice of termination and had access to all that important information. They had access to everything. They didn't produce any of it. Didn't even have counter-testimony. After merely Eschbach testified that she never got that stuff, the HR person was still there. Why didn't she get back up and say, oh, yes, we served them. This is true. They didn't address it. They have no explanation for the strange and quote-unquote coincidental timing. It's not a coincidence. They did it in bad faith to deny the pension, if they did it at all. Thank you, counsel. Thank you very much. At this time, the court will take the matter under advisement and render a decision in due course. Court stands in recess until the next case. Thank you.